Docket No. 8914.   Promulgated February 19, 1927.

1. The fair market value of purchase money second mortgage notes received on sale of Ford automobiles, determined.

2. Where additions to reserve, or $3,672.05, for losses, were not shown to be insufficient to cover anticipated losses on such notes, the respondent's inclusion of the notes in income at face value approved.

*Yandell Boatner, Esq.,* for the petitioner.
*J. Arthur Adams, Esq.,* for the respondent.

This proceeding results from the determination by the Commissioner of deficiencies in income and profits tax for the calendar year 1921, in the amount of $4,445.38, of which $4,410.65 is in controversy. That part of the deficiency contested by petitioner results from the Commissioner's action in including, at their face value, in petitioner's income, promissory notes in the amount of $12,267.70. Petitioner avers that such notes had no fair market value and the addition to income is erroneous. The Commissioner denies that the notes had no fair market value, and also contends that the reserve for bad debts deducted was sufficient to cover losses resulting from inability to collect on the notes.

### FINDINGS OF FACT.

Petitioner is a Louisiana corporation with its principal office at 306 Market Street, Shreveport. It was, during the year in question, engaged in the selling of Ford automobiles and accessories and rendering service to automobile owners. The commission derived from the sale of cars was 17½ per cent of the list price fixed by the Ford Motor Co. During 1921 the gross profit from the sale of a touring car and a roadster was $78.75 and $63.00, respectively.

During 1921, and prior thereto, petitioner had established the practice of selling Ford cars upon a deferred payment plan. A prospective purchaser made out a statement indicating his financial condition, upon which petitioner based its investigation as to his credit standing. In such sales, petitioner's practice was to require a down payment of $208 on touring cars and $196 on roadsters, the balance of the purchase price being represented by a series of 12 notes falling due over a period of 12 months, beginning with the first of the month following the date of sale. The notes were equal in amount; included charges for handling, service, brokerage and insurance; bore interest from the date of maturity; and were secured by a first mortgage on the car sold, which was subject to foreclosure upon default in payment of any one of the notes.

At that time petitioner was selling the notes, when they were sold, to the Meyer-Keyser Corporation, of Indianapolis, Ind., a finance corporation. Under the arrangement with the latter corporation, the notes were indorsed without recourse and placed with the First National Bank of Shreveport for collection. Petitioner would then draw a draft on the Meyer-Keyser Corporation for the balance due on the car, which gave it the cash just as if the sale had been made for cash.

During the latter part of 1921, the petitioner was required by the Ford Motor Co. to purchase more automobiles than it believed could be sold. To escape the cost of storage and the payment of interest on the oversupply, petitioner conceived and carried out a sales plan to attract purchasers. It advertised and sold the Ford cars, both touring and roadster, on a deferred plan requiring a down payment of $125; a series of 12 first mortgage notes for amounts equal to the amount represented by the notes, which it had been accustomed to receive and sell to the Meyer-Keyser Corporation under its former plan; and a second series of 12 notes secured by a second mortgage on the car sold, for the balance of the purchase price, or approximately $90.41 and $77.00 on the touring cars and roadsters, respectively. The balance represented by the second mortgage notes was somewhat in excess of the petitioner's commission. These notes were similar to the first mortgage notes, except that interest was included in the face of the notes. The new sales plan was put in operation about November 23, 1921, and continued until the close of the year. The due dates of the notes received, both first and second mortgage series, dated from January 1, 1922, and one of each series fell due on the first of each month in 1922. The first mortgage notes were sold on the same terms as formerly to the Meyer-Keyser Corporation. The second mortgage series were held by the petitioner. The holders of either the first or the second mortgage notes could foreclose upon default in payment of any one note. The same statement, as to financial condition, was required of the purchaser under the new sales plan as had been required under the old, but very little investigation of credit standing was made by petitioner.

The petitioner also handled used and repossessed cars and accessories and rendered service to car owners. Credit was extended in all of these departments, as well as on the sale of new cars. The credit extended was represented by both open accounts and notes receivable. The amount of open accounts standing on petitioner's books as of December 31, 1921, is not shown. The total of notes receivable of $58,030.03, as of that date, includes notes received on the sale of used and repossessed cars as well as new cars. The face value of second mortgage notes received in the sale of new cars under the new credit plan carried out during November and December of 1921, was $12,267.70. Petitioner collected $10,149.00 of this latter amount during the year 1922 and additional sums in subsequent years. The fair market value of the second mortgage notes of the face amount of $12,267.70 was $8,750, which is $3,517.70 less than their face value.

Petitioner kept its books on an accrual basis and made its returns on the calendar year basis. When a car was sold, under the new sales plan, the customer was charged with the selling price, includ-

ing accessories. He was then credited with the cash payment, the amount of the draft drawn on the Meyer-Keyser Corporation and the amount of the second mortgage notes, less interest, to balance the account. The second mortgage notes received were entered into the notes receivable account but were credited to unearned profits as a closing entry for the year, thereby creating a reserve of $12,267.70, which was deducted from profits.

Petitioner also carried a reserve for losses. Additions to such reserves on account of bad debts, in the amount of $7,820.86, were claimed and allowed as deductions for 1921. Of this $7,820.86, all but $3,672.05 was shown to be applicable to open accounts and notes receivable, other than the second mortgage notes. The item of $3,-672.05 was to cover losses on notes outstanding in the amount of $18,279, the balance due on 147 cars sold. Whether these 147 cars sold and the notes received therefor include the cars sold under the emergency plan and the second mortgage notes of $12,267.70, was not established.

The Commissioner added the amount of $12,267.70 to petitioner's income for 1921, for the reason that it appeared that the bad debt reserve was considered sufficient to take care of any losses resulting from default in the payment of the second mortgage notes.

### OPINION.

MILLIKEN: The petitioner contests that part of the deficiency due to the Commissioner's action in adding the $12,267.70 in second mortgage notes to its income for the year in question. It is not disputed that petitioner was on an accrual basis and that such notes were received in 1921 and were income to it to the extent of the fair market value thereof. Petitioner's contention is that the notes had no fair market value when received, and, accordingly, should be entirely eliminated in the computation of income for 1921.

The testimony shows that it was generally considered unsafe to sell a Ford automobile on a deferred payment plan for less than 33⅓ per cent cash, where the only security for the balance was a mortgage on the car sold. It was also shown that the sales plan carried out by petitioner, to dispose of an oversupply of cars, by requiring a cash payment of from 20 to 25 per cent, had not been theretofore tried by retail automobile dealers. The second mortgage notes taken by petitioner were certainly not sufficiently secured to make the notes worth face value.

On the other hand, it is admitted by petitioner that they had some value. Petitioner did not sell or offer to sell any of such notes. Three bankers of the locality in which the business of petitioner is located

and who had experience in passing on automobile paper, were of the opinion that the notes were not commercial paper unless indorsed by a responsible dealer, and, if such paper was offered in lots in the usual way, their banking firms would not even consider the lots worth investigating. One of them stated that the actual worth of the notes would depend upon the maker, though responsible persons did not usually purchase cars on terms requiring a first and second mortgage. We do not think the fact that such notes would not have been accepted by a bank as commercial paper without investigating the individual maker establishes the absence of any fair market value in the notes. The fact that nearly 83 per cent of the face value of the notes, or $10,149.00, was collected in 1922, the year in which they were due, was brought out by questioning of the principal witness by the Board. Although that fact was not available in determining the fair market value of the notes when they were received, we think it, when properly discounted in the light of the other evidence, tends to afford some criterion concerning the fair market value of the notes in question. After a careful consideration of all the evidence, we are of the opinion that the fair market value of the second mortgage notes, when they were received, was $8,750, and should have been reflected in computation of gross income in that amount. The difference between the face value and the fair market value of such notes is $3,517.70.

However, the deficiency in controversy is not based solely upon the determination that the notes were worth their face value. It appears, from the evidence of record that the Commissioner considered that the reserve for bad debts maintained by petitioner was sufficient to cover losses upon the second mortgage notes in question and to grant any further allowance would be to allow a double deduction. The facts of record do not rebut the presumption. We have found as a fact that there is a bad debt item of $3,672.05, which is not shown by petitioner to have been deducted on account of obligations other than the notes in controversy. Since this item, not accounted for, is greater than the difference between the face value and the fair market value of the notes in question, or $3,517.70, we are unable to determine that the Commissioner committed error in the determination of the deficiency. Petitioner was specifically put on notice as to the proof required, not only by the statement attached to the deficiency letter, but by the evidence adduced at the hearing of this proceeding by counsel for the Commissioner.

*Judgment will be entered for the respondent.*